## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **v.** | ) |
| | ) **2:17-cr-00147-JDL** |
| **SEAN MULKERN,** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

The Defendant, Sean Mulkern, is charged with possessing a controlled substance with intent to distribute, in violation of 21 U.S.C.A. § 841(a)(1) (West 2018), possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C.A. § 924(c)(1)(A) (West 2018), and as a felon in possession of a firearm, in violation of 18 U.S.C.A. § 922(g)(1) (West 2018). Mulkern seeks to suppress all evidence and statements obtained by the police as a result of a search of his person and vehicle, and all evidence obtained thereafter following the issuance of a search warrant.

## I. FACTUAL BACKGROUND

Mulkern was subjected to a patdown search of his person in Westbrook following the stop of his car by the police on May 25, 2017. The search resulted in the discovery of a crystal of crack cocaine in a cigarette pack in Mulkern's jacket pocket, which led the police to conduct a warrantless search of Mulkern's car in which they found additional drugs, a substantial amount of money, and a handgun. This information was then included in a warrant affidavit that was used to secure a search warrant. The execution of that warrant led to the seizure of additional drugs, drug

paraphernalia, and firearms stored in a Winnebago motor home belonging to Mulkern.

## A.    The Incident at the Timberline Country Store

On May 24, the day before Mulkern's vehicle was stopped by the Westbrook police, Officers Jessica Ramsay and Warren Day of the Buxton Police Department responded to a dispatch call involving a possible incident involving road rage and a threat with a gun at the Timberline Country Store in Buxton.  The 911 dispatcher relayed a report that the driver of a white Corvette with red rims had pulled a gun on a man at the Timberline.  The driver was described as a thin male wearing a white shirt and baseball cap.  The dispatcher also provided the Maine motor vehicle registration number for the Corvette, which had already left the scene.  The dispatcher advised, however, that the Maine registration number provided, "2512VW," was assigned to a black Lexus, not a white Corvette.

While en route to the Timberline, Officer Day spoke by phone with Scott Wallingford, who had made the initial call to the police about the incident. Wallingford stated that a man in a white Corvette had pulled out a gun and threatened him with it.  Wallingford and the two other men who were with him at the Timberline had left and were no longer at the store when Officers Day and Ramsay arrived.

At the Timberline, Officer Ramsay viewed the store's surveillance video of the altercation.  The video showed three men exiting a pickup truck and approaching a white Corvette, which had red stripes running the length of the vehicle and red rims, that was being operated by a white male.  The four men appeared to argue, and the

driver of the Corvette could eventually be seen reaching for an unidentified object in the back of the car and then holding it at the center of his chest. Upon seeing the object, the behavior of the three men became elevated and they started yelling and pointing. Due to the quality of the video, Officer Ramsay was not able to identify the object being held by the driver as a gun. The video showed the men continuing to argue until the Corvette drove away as the driver continued yelling at the three men.

As Officer Ramsay watched the video, she made comments which were recorded on the audio track of her WatchGuard video camera. She stated several times that it appeared that the three men were the aggressors who, by their threatening conduct, appeared to be "asking for it" by placing the driver of the Corvette in fear for his own safety.

Officer Ramsay also interviewed and took a statement from a Timberline employee who stated that he had seen the incident through a window from inside the Timberline's truckers' lounge. The employee explained that he saw three large men wearing green fencing company shirts yelling at a skinny man, "most likely about 50 years of age," who was operating a white car with two red stripes. The employee reported that before the car drove away, the three men kept approaching the car and yelling at the driver to get out and fight. He also reported that the driver had attempted to get out of the car several times, but was not able to because he had not put his car in park; that the driver was yelling at the three men as the Corvette drove away; and that the three men then entered the store and asked for someone to call the police. The three men told the employee and a second employee that prior to arriving at the Timberline, the driver of the Corvette had dangerously sped by them

on the road, that they had followed the Corvette into the Timberline parking lot, confronted the driver about his driving, and that the driver had then pulled out a gun. The employee who gave the statement then went outside and helped one of the three men sweep up the shattered pieces of a cell phone which the man had thrown at the Corvette. The employee had not seen a gun during the incident.

After investigating the scene, Officer Ramsay decided to issue a be-on-the-lookout report (the "Bulletin") to the statewide police broadcast concerning the Corvette and its operator. The Bulletin read:

> *** Caution Officer Safety ***
> On todays date Buxton Police Department took a report of a male in a white Corvette with red rims was in a[n] altercation at Timberline Country Store 222 Narragansett Trail. The operator a male in his 40's white shirt and ball cap, pulled out a hand gun and showed it to the victim. The vehicle was last seen headed toward Gorham. If located stop and identify the driver.
> Thank you for any assistance.

Def. Ex. 1 (all capitalization omitted). At the time the Bulletin was issued, Officer Ramsay believed that the information she had was not enough to enable her to determine who was the victim and who was the aggressor during the altercation, but she wanted to interview the driver of the Corvette because a gun had been involved in the incident.

## B.    The Traffic Stop

On May 25 at approximately 2:15 pm, Sgt. Timothy Morrell of the Westbrook Police Department, who had read the Bulletin, spotted a white Corvette with red rims in Westbrook. The Corvette matched the description from the Bulletin and it bore Maine registration 2513VW. Sgt. Morrell ran a search of the Corvette's registration

number in the Bureau of Motor Vehicles database, which identified Sean Mulkern as the registered owner. Sgt. Morrell observed that the driver was a white male in his 40's wearing a baseball cap. He then contacted the Buxton Police Department and spoke with Chief Troy Cline, who confirmed that the Corvette's registration was one digit off from the registration number 2512VW that had been reported the prior day. This led Sgt. Morrell to determine that the Corvette was the same vehicle identified in the Bulletin. Chief Cline indicated that he would join Sgt. Morrell at the scene to assist with identifying the driver of the Corvette.

Sgt. Morrell continued his surveillance of the Corvette, which was now parked in the driveway of a residence on Berkeley Street. He ran a criminal background check on Mulkern, which revealed that Mulkern had a history of drug-related charges and was a convicted felon. Sgt. Morrell subsequently observed Mulkern standing outside the car with a locksmith who had arrived to unlock the Corvette; it appeared that Mulkern had locked his keys in the car. Sgt. Morrell was able to positively identify Mulkern based on a photograph of Mulkern in the Bureau of Motor Vehicles database.

Sgt. Morrell contacted Officer Philip Robinson and Sgt. Brian Olson of the Westbrook Police Department, both of whom responded to Sgt. Morrell's location to assist with surveillance. Sgt. Morrell did not want to immediately approach and have contact with Mulkern because Chief Cline had not yet arrived. His plan changed, however, when he observed Mulkern get into the Corvette and begin to back the car out of the driveway. As the Corvette backed out, Sgt. Morrell intuited that Mulkern had spotted Sgt. Morrell's marked police cruiser because the Corvette's direction

abruptly changed so that it drove away from, rather than towards, Sgt. Morrell's car. Sgt. Morrell activated his cruiser's blue lights and initiated a traffic stop.

Sgt. Olson, who had his gun drawn but pointed down, and Sgt. Morrell approached the Corvette. Sgt. Morrell ordered Mulkern out of the vehicle, and directed him to place his hands on the rear of the car. Both officers observed that Mulkern appeared to be under the influence of drugs or alcohol. His eyes were bloodshot, his behavior was jittery and, as described by Sgt. Olson, he appeared to be "amped up." ECF No. 48 at 117. Sgt. Morrell, while standing on Mulkern's left side with Sgt. Olson on Mulkern's immediate right, conducted a patdown search for weapons, but found none. Sgt. Morrell informed Mulkern that he was not under arrest.

As Sgt. Morrell stopped his patdown,[1] Sgt. Olson immediately continued the patdown, including areas already covered by Sgt. Morrell. Sgt. Olson felt an object in the upper right breast pocket of Mulkern's jacket, which he immediately recognized by touch to be a hypodermic needle. Sgt. Olson asked Mulkern if the object was a needle. Mulkern initially said "no" and then reached for his pocket, at which point Sgt. Olson placed Mulkern in handcuffs and then removed the needle. In response to Sgt. Olson's questions, Mulkern stated that the needle belonged to his girlfriend, who was diabetic, and that it was clean and unused, which it was.

Sgt. Olson believed the needle to be drug-related contraband, so he continued searching Mulkern. Sgt. Olson then felt a package of cigarettes in Mulkern's lower

---

[1] Sgt. Morrell testified that his patdown search was not complete and that he intended to rely on Sgt. Olson to finish the search so that he could take a "global view" of the situation.

right jacket pocket, which he removed from the pocket. The package contained what appeared to be a crystal of crack cocaine that was visible under the package's outer cellophane wrapper. Mulkern then volunteered: "That is mine . . . the needle isn't." Gov. Ex. 9 at 1. Sgt. Olson then asked him why he was fidgety, to which Mulkern replied that he didn't want to get in trouble for a "little piece of crack." *Id.* at 1-2.

With Mulkern handcuffed and standing at the trunk of his car, Sgt. Olson began a vehicle search. Inside the Corvette, Sgt. Olson discovered a black zippered bag containing several baggies of what appeared to be crack cocaine, and approximately $13,000 in cash. Unprompted, Mulkern stated "There you go, you got it right there," or words to that effect. Gov. Ex. 9 at 2. Officer Robinson then read Mulkern a *Miranda* warning, and Mulkern was placed in a police cruiser. Sgt. Olson also discovered a .9mm handgun inside the Corvette.

Chief Cline arrived at the scene of the stop around the time Sgt. Olson began the vehicle search. After arriving, Chief Cline notified Officer Ramsay, and she and Officer Day traveled to the stop intending to interview Mulkern about the Timberline incident. Once they arrived, Officer Day also read a *Miranda* warning to Mulkern who responded that he wasn't in Buxton the prior day and was not going to answer any questions.

## C.    The Search Warrant

Later that day, Special Agent Joshua McDonald of the Maine Drug Enforcement Agency ("MDEA") secured a warrant to search a Winnebago registered to Mulkern, in which agents found additional drugs, drug paraphernalia, and firearms. The warrant affidavit was based in part on the evidence and statements

obtained in connection with Mulkern's stop and arrest on May 25, a proffer statement made by an informant eight days earlier, and a statement given by an occupant of the Berkeley Street residence who was interviewed soon after Mulkern's arrest. The informant had reported having recently seen Mulkern in possession of 10 ounces of cocaine base and 4 ounces of suspected cocaine HCL, and $10,000 in U.S. currency. The informant also reported that Mulkern was always in possession of some sort of short handgun, and that he kept numerous firearms in his motor home in Casco, Maine. The occupant of the Berkley Street residence told the police that she had called Mulkern and that he had come to her house on May 25 to sell her drugs.

## II. LEGAL ANALYSIS

Mulkern argues, first, that the traffic stop of his vehicle was an unreasonable search and seizure under the Fourth Amendment, and that all evidence discovered during and as a result of that search must be suppressed. Second, he argues that even if the traffic stop was lawful, the officers' search of his person was not, and that all evidence discovered during that search—and the evidence discovered later pursuant to the search warrant—must be suppressed. He further argues that any statements he made after being handcuffed and before he was read his *Miranda* rights should be suppressed because he was in custody. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966).

The Government has put forth several arguments in response. First, the Government contends that the officers had probable cause to arrest Mulkern at the time they stopped his vehicle on May 25 for the crimes of felon in possession of a firearm and brandishing a firearm, both of which he allegedly committed on May 24,

and that all evidence discovered during his patdown and thereafter was lawfully obtained as part of a search incident to arrest. In the alternative, the Government argues that even absent probable cause to arrest from the outset, the officers were justified in undertaking an initial *Terry* investigatory stop of Mulkern's car and that they subsequently obtained probable cause to search his car and person when they discovered contraband during a legal patdown of Mulkern's person.[2] *See generally Terry v. Ohio*, 392 U.S. 1 (1968).

## A.  Probable Cause

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. "It is common ground that a traffic stop constitutes a seizure of both the stopped vehicle and its occupants for Fourth Amendment purposes." *United States v. Arnott*, 758 F.3d 40, 43 (1st Cir. 2014). A brief investigatory stop—known as a *Terry* stop—"based on a reasonable suspicion that criminal activity may be afoot does not violate the Fourth Amendment, even in the absence of probable cause." *United States v. Pontoo*, 666 F.3d 20, 27 (1st Cir. 2011) (citing *Terry*, 392 U.S. at 29-30). In contrast to a *Terry* stop, an officer may only make a warrantless arrest if the officer has probable cause to believe that a crime has been committed. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

---

[2] The Government further argues that the officers were justified in temporarily detaining Mulkern for operating under the influence, as both Sgts. Morrell and Olson witnessed Mulkern operating the Corvette and believed Mulkern to be under the influence of drugs or alcohol. The Government does not specify whether Mulkern's appearance provided probable cause to arrest or merely a reasonable suspicion to stop and perform a limited patdown search. Because I find that the officers had probable cause to arrest Mulkern at the time of the traffic stop on other grounds, I do not consider this argument further.

The Government argues that at the time of the stop, Sgts. Morrell and Olson had probable cause to arrest Mulkern for having committed the offenses of being a felon in possession of a firearm and having brandished a firearm the prior day, and that the resulting searches of his person and vehicle were appropriate as searches incident to arrest. *See United States v. Robinson,* 414 U.S. 218, 235 (1973) (holding that the police have the authority to conduct "a full search of the person" incident to a lawful arrest). Mulkern argues that the officers had neither probable cause to arrest nor a reasonable articulable suspicion supporting an investigatory *Terry* stop when they pulled him over. For the reasons I will explain, the factual scenario presented here makes the probable cause determination a close call, but demonstrates that the stop of Mulkern's car on May 25 and the searches that followed were supported by probable cause to arrest Mulkern for the crime of having been a felon in possession of a firearm on May 24.

Probable cause to effectuate an arrest exists "when, at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009) (ellipses in original, internal quotation marks omitted) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). "[P]robable cause is a fluid concept" that must be evaluated upon the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 232 (1983). "The principal components of a determination of . . . probable cause will be the events which occurred leading up to the stop or search, and then the decision

whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). "It 'requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act.'" *United States v. Rasberry*, 882 F.3d 241, 250 (1st Cir. 2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). When reviewing the existence of probable cause, courts look to the "collective knowledge" available to the law enforcement officers participating in the investigation rather than isolating the information known by the individual officer or officers who effect the arrest. *United States v. Azor*, 881 F.3d 1, 8 (1st Cir. 2017); *see also Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983) ("[W]here law enforcement authorities are cooperating in an investigation . . . the knowledge of one is presumed shared by all."); *United States v. Fiasconaro*, 315 F.3d 28, 36 (1st Cir. 2002) (same).

Here, the Buxton and Westbrook police officials are fairly viewed as having cooperated in the investigation resulting in the traffic stop. Sgt. Morrell and the other Westbrook officials who performed the stop on May 25 were acting in response to the Bulletin issued by Buxton Officer Ramsay on May 24, and Sgt. Morrell sought to coordinate the stop with Buxton Chief Cline on May 25. Chief Cline ultimately arrived at the scene of the stop, as did Buxton Officers Ramsay and Day. *See Azor*, 881 F.3d at 8 (recognizing that the court considers "the collective information known to the law enforcement officers participating in the investigation rather than isolate the information known by the individual arresting officer" where the law enforcement authorities are cooperating in an investigation).

For the following three reasons, the collective information available to Buxton and Westbrook officials on May 25 established probable cause that Mulkern was a convicted felon who had possessed a firearm at the Timberline on May 24.

First, the collective information available to the police gave them a reasonable basis to believe that the operator of the Corvette on May 24 was in possession of a firearm at the Timberline. Sgt. Morrell had received the Bulletin issued by Officer Ramsay and had spoken with Chief Cline about the status of the investigation into the incident at the Timberline. The Bulletin indicated that the driver of the distinctive white Corvette was in possession of a firearm, and that this information was based on the report of the victim. "The uncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause." *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 10 (1st Cir. 2004); *see also Holder*, 585 F.3d at 505 (finding existence of probable cause to arrest for assault due to information furnished by victim despite countervailing evidence suggesting victim had initiated altercation). Further, the initial report by Wallingford—the putative victim—that the driver of the Corvette had threatened him with a firearm, as well as his subsequent report to Officer Day, were partially corroborated by the Timberline's surveillance video which showed the driver of the Corvette reaching for and then holding at chest level an indecipherable object that caused Wallingford and his companions to respond in a manner consistent with a gun having been pulled out. Wallingford's report was also supported by his two companions who also told the Timberline employees that the driver had pulled out a gun. Although the surveillance video left Officer Ramsay uncertain as to whether the driver of the Corvette was

justified in displaying a gun, she was sufficiently certain that a gun had been displayed as to cause her to issue a Bulletin and pursue an investigation.

Second, the collective information available to the police provided a reasonable basis to believe that Mulkern was the driver of the Corvette who possessed a firearm at the Timberline on May 24. The Bulletin issued by Officer Ramsay described a unique-looking Corvette, and its driver. The next day, Sgt. Morrell spotted Mulkern's Corvette in a neighboring town, and the car matched the Bulletin's description. Its registration number was almost an exact match of the registration given by the witnesses at the Timberline, which Sgt. Morrell confirmed with Chief Cline. It was reasonable, therefore, to believe that the white Corvette with two red racing stripes, red rims, and a nearly identical registration number was the same Corvette involved in the incident the day before at the Timberline, roughly 13 miles away. Sgt. Morrell was also able to positively identify Mulkern as the car's registered owner on May 25 based on the Bureau of Motor Vehicle's records, so it was reasonable to believe that the man Sgt. Morrell had stopped—Sean Mulkern—was the registered owner of the Corvette. Finally, Mulkern matched the physical description of the driver of the Corvette on May 24 given in the Bulletin: a male in his 40's wearing a baseball cap.[3] Viewed objectively, this information provided a reasonable basis to deduce that Mulkern was the person operating his Corvette at the Timberline on May 24.

Finally, there was a reasonable basis to believe that Mulkern was a convicted felon. The criminal background check run by Sgt. Morrell reported that Mulkern—

---

[3] Although the employee who Officer Ramsay interviewed stated that the driver of the Corvette was "most likely 50 years of age," Officer Ramsay testified that she remembered varying accounts on May 24, some putting the driver in his 40's, some in his 50's. Mulkern was 50 years old at the time of the arrest on May 25.

the man Sgt. Morrell visually identified driving the Corvette on May 25—had a history of drug-related charges, and was a convicted felon.

Taken together, the collective information available to the police on May 25, including (1) that the operator of the Corvette was in possession of a firearm at the Timberline on May 24, (2) that Mulkern was the person operating the Corvette at that time, and (3) that Mulkern was a convicted felon, warranted a prudent officer in believing that Mulkern was a felon who had possessed a firearm at the Timberline on May 24.

This conclusion is not undermined by Sgt. Morrell's testimony that he did not believe he had probable cause to arrest at the time he stopped Mulkern's vehicle, and that he was instead fear of initiating a more limited *Terry* investigative stop.[4] Both the reasonable suspicion inquiry and the more demanding probable cause inquiry are objective, not subjective, and the "actual motive or thought process of the officer is not plumbed," *Bolton v. Taylor*, 367 F.3d 5, 7 (1st Cir. 2004) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)), so long as the "circumstances, viewed objectively, justify that action." *Devenpeck*, 543 U.S. at 153. Viewed objectively, the totality of

---

[4] The Government also argues that Sgt. Olson lawfully removed the cigarette package from Mulkern's jacket as part of a *Terry* search. This argument is unavailing. "[A] protective [*Terry*] search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause—must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 26); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("The purpose of [a *Terry* frisk] is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. . . ."). There is no evidence in the record—and the Government does not argue—that the cigarette package, as felt in Mulkern's jacket, could have been (or could have been perceived as) a weapon. A package of cigarettes, without extenuating circumstances suggesting the possibility of danger, is not a weapon and was of no threat to the officers. *See State v. Sheehan*, 99-k-0725 (La. 7/2/99); 767 So. 2d 1, 1 (per curiam) ("[T]he seizure and search of the cigarette pack from relator's shirt pocket, which led to the unfolding of crumpled cellophane at the bottom of the pack and to the discovery of a single rock of cocaine concealed within the cellophane, exceeded the permissible scope of the pat-down frisk sanctioned by *Terry*. . . ."). The removal of the cigarette package therefore would have exceeded a lawful *Terry* frisk. *See Dickerson*, 508 U.S. at 373 ("If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed."); *see also United States v. Campa*, 234 F.3d 733, 739 (1st Cir. 2000).

the information available to law enforcement officials at the time of the traffic stop of the white Corvette on May 25 established probable cause to support the warrantless arrest of Mulkern for having been a felon in possession of a firearm on May 24.

Because there was probable cause to arrest Mulkern at the time of the stop for having been a felon in possession of a firearm on May 24, the officers had the authority to conduct "a full search of [Mulkern's] person incident to a lawful arrest." *United States v. Wurie*, 728 F.3d 1, 4 (1st Cir. 2013) (internal quotation marks omitted) (quoting *Robinson*, 414 U.S. at 235-36 (holding that warrantless search of a cigarette package in defendant's pocket containing heroin was lawful as incident to an arrest for driving with a revoked license)). The crystal of crack cocaine found in the cigarette pack in Mulkern's pocket was therefore lawfully discovered and is not subject to suppression.

The officers were further justified in searching Mulkern's vehicle. A search of a vehicle incident to arrest can be made "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 343 (2009) (internal quotation marks omitted). Here, under *Gant*, the search of the Corvette was authorized because the officers could have reasonably believed the vehicle would contain either or both the gun Mulkern purportedly possessed the day before or additional drugs. The evidence recovered from the Corvette was therefore lawfully discovered.

Because the search of Mulkern's person on May 25 was supported by probable cause that Mulkern was a felon in possession of a firearm on May 24, and the search of his car was supported by that probable cause coupled with probable cause that he

was in possession of crack cocaine on May 25, there is no reason under the Fourth Amendment to suppress Mulkern's unsolicited statements made in reaction to those searches as fruits of the poisonous tree. *See United States v. Siciliano*, 578 F.3d 61, 68 (1st Cir. 2009) ("[T]he exclusionary rule prohibits the introduction of tangible and testimonial evidence that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint.") (quoting *Murray v. United States*, 487 U.S. 533, 536-37 (1988)) (internal quotation marks omitted).

In addition, the evidence recovered from Mulkern's person and vehicle, as well as Mulkern's statements, were cited in the affidavit submitted by Special Agent McDonald to secure a search warrant of Mulkern's Winnebago. Because this evidence was lawfully discovered, there is no basis to challenge the warrant or suppress the evidence recovered from the Winnebago.

The Government also argues that there was probable cause at the time of the stop to arrest Mulkern for brandishing a firearm. Officer Ramsay's spoken impressions of the Timberline incident that were recorded as she watched the Timberline's surveillance video indicate that the driver of the Corvette may have been justified in pulling out the gun because he legitimately feared for his own safety due to the threatening behavior by the three men. Officer Ramsay's comments reflect that the surveillance video would cause a reasonable officer to conclude that the evidence specifically related to a possible charge that the driver of the Corvette unlawfully brandished a firearm did not meet the probable cause threshold.

## B.    Fifth Amendment

Although Mulkern's statements were not the fruit of an illegal search under the Fourth Amendment, Mulkern further argues that his statements made after he was handcuffed were elicited in violation of the Fifth Amendment because they were obtained without prior warning in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).

After being handcuffed, but before being read a *Miranda* warning, Mulkern made several incriminating statements, including: (1) acknowledging that the crystal of crack cocaine found on his person was, in fact, a "little piece of crack," and was his; and (2) acknowledging that he was aware of the drugs and money found in his car. Mulkern argues that these statements—and any other statements he made before receiving a *Miranda* warning—are inadmissible because the Fifth Amendment requires "the exclusion of incriminating statements obtained during custodial interrogation" without a *Miranda* warning. *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984) (citing *Miranda*, 384 U.S. at 467-69, 475-77); *see also United States v. Campbell*, 741 F.3d 251, 265 (1st Cir. 2013). Mulkern must therefore show that he was in police "custody," and that the statements were elicited by "interrogation." *United States v. Sanchez*, 817 F.3d 38, 44 (1st Cir. 2016).

I conclude as a threshold matter that Mulkern was in police custody from the moment that Sgt. Olson found the crystal of crack cocaine on his person.[5] Although

---

[5] Mulkern argues that he was in custody the moment he was handcuffed. Although the use of handcuffs and an officer drawing his or her weapon—which Sgt. Olson did as he approached the Corvette—are indicia of a traditional arrest requiring a *Miranda* warning, *United States v. Rabbia*, 699 F.3d 85, 92-93 (1st Cir. 2012); *United States v. Fornia-Castillo*, 408 F.3d 52, 64-65 (1st Cir. 2005), they may nevertheless be used as part of an investigatory detention when there is "some specific fact or circumstance that could have supported a reasonable *(continued next page)*

the police may "diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly, during which time it [may be] necessary to detain the defendant," *United States v. McCarthy*, 77 F.3d 522, 530 (1st Cir. 1996), here, the officers had *already* found contraband—the crack cocaine on Mulkern's person—when Mulkern made his inculpatory statements. The officers were therefore no longer investigating whether a crime had been committed, but were seeking additional evidence of that crime. In such circumstances, a reasonable person in Mulkern's position would have understood his position as "tantamount to being under arrest." *Chaney*, 647 F.3d at 409.

Mulkern's statements suggest as much: he explained his fidgety behavior as due to his fear of getting in trouble for possessing the crack cocaine found in the cigarette pack. Furthermore, upon finding the crystal of crack cocaine, Sgt. Olson twice intoned "uh oh," indicating that the nature of the stop had changed. Approximately 90 seconds later, Sgt. Olson told Mulkern, "Why do you think we're going to let you go? You've got drugs on you" in response to Mulkern's plea to "please just let me go." Although this later statement came after Mulkern's admission that the crack was his, as well as his references to it as a "little piece of crack," it reinforces what would already have been reasonably clear to Mulkern from the moment the cocaine was found: that there was a "restraint on [his] freedom of movement of the

___

belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to undue risk of harm." *United States v. Chaney*, 647 F.3d 401, 409 (1st Cir. 2011) (quoting *United States v. Acosta-Colon*, 157 F.3d 9, 18-19 (1st Cir. 1998)). Such was the case here: the officers had a legitimate concern that Mulkern could be armed and dangerous given that he had purportedly threatened someone with a gun the day before. Furthermore, during Sgt. Olson's frisk, Mulkern moved to grab something from his pocket, which gave the officers further cause to protect their safety by handcuffing him.

degree associated with a formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (internal quotation marks omitted).

Once in custody, Mulkern made statements, including references to the "little piece of crack," that were prompted by police questioning that constituted an interrogation. After finding the crystal of cocaine, Sgt. Olson began asking Mulkern a series of questions, including: "Why are you so fidgety?", "Am I going to find anything else on you or in this car?", and—immediately before Mulkern's first reference to a "little piece of crack"—"What are you scared about?", before continuing to ask whether there was anything else he was going to find.

"[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). "The functional equivalent of questioning is any words or action on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Davis*, 773 F.3d 334, 339 (1st Cir. 2014) (internal quotation marks omitted) (quoting *Innis*, 446 U.S. at 301). Sgt. Olson's questions both explicitly ("Am I going to find anything else on you or in this car?") and implicitly ("What are you scared about?") encouraged Mulkern to reveal the existence of additional contraband and were thus reasonably likely to elicit an incriminating response. Any statements Mulkern made in response to Sgt. Olson's questioning, including several references to having a "little piece of crack," were therefore obtained in violation of the Fifth Amendment and must be suppressed as evidence for that reason.

Even so, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda*, 384 U.S. at 478. Mulkern's initial statement that the crystal of crack cocaine in the cigarette package was his ("That is mine . . . the needle isn't."), as well as his statement regarding the drugs and money found in the Corvette ("There you go, you got it right there."), were both made spontaneously without any prompting or questioning by the officers. Thus, these two statements were not obtained through custodial interrogation and, therefore, were not obtained in violation of Mulkern's Fifth Amendment right against self-incrimination.

Accordingly, the motion to suppress is denied as to these voluntary statements, but is granted as to all of Mulkern's non-spontaneous statements made in response to, or prompted by, Sgt. Olson's questioning after the crystal of cocaine was found on Mulkern's body and before he was read a *Miranda* warning.

### III. CONCLUSION

For the foregoing reasons, Mulkern's supplemented motion to suppress (ECF No. 33) is **GRANTED IN PART** as to all of Mulkern's non-spontaneous statements made in response to, or prompted by, Sgt. Olson's questioning after the crystal of cocaine was found on Mulkern's body and before he was read a *Miranda* warning. Those statements are suppressed and may not be introduced as evidence. The motion is otherwise **DENIED** in all respects. Mulkern's prior filed motion to suppress (ECF No. 31) is **DENIED** as moot.

**SO ORDERED.**

Dated this 7th day of December, 2018.

_____
/s/ JON D. LEVY
U.S. DISTRICT JUDGE